[No. H039055. Sixth Dist. Dec. 30, 2015.]

JMR CONSTRUCTION CORP., Plaintiff, Cross-defendant and Respondent,
v.
ENVIRONMENTAL ASSESSMENT AND REMEDIATION
MANAGEMENT, INC., Defendant, Cross-complainant and Appellant,
SURETEC INSURANCE COMPANY, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

ʳPursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I.A., I.C., III., IV., V., and VI. of the Discussion.

## COUNSEL

Horvitz & Levy, Peter Abrahams and Mitchell C. Tilner for Defendant and Appellant.

Urtnowski & Associates, J. Brian Urtnowski and Lisamarie McDermott for Defendant, Cross-complainant and Appellant.

Miller Law Group and Joseph P. Mascovich for Plaintiff, Cross-defendant and Respondent.

## OPINION

MÁRQUEZ, J.—This dispute arose from a public works project involving the construction of a dental clinic at the Presidio of Monterey (the Project). The owner, the United States Army Corps of Engineers (the Corps), retained JMR Construction Corp. (JMR) as general contractor for the Project. JMR, in turn, entered into various subcontracts, including separate electrical and plumbing subcontracts, with Environmental Assessment and Remediation Management, Inc. (EAR). SureTec Insurance Company (SureTec) issued separate bonds guaranteeing EAR's performance under the two subcontracts.

While the Project was ongoing, JMR (1) communicated with EAR about alleged delays, deficient and late submittals, and improper plumbing work, and (2) retained certain funds otherwise due to EAR under the subcontracts. After the Project was completed, JMR filed suit against EAR and SureTec (collectively, defendants) for breach of contract and for foreclosure of the performance bonds. JMR alleged it was damaged as a result of EAR's failure to perform under the two subcontracts. EAR filed a cross-complaint for recovery of retention funds withheld under the subcontracts.

After a court trial, JMR was awarded the net amount of $315,631, which included an offset for the retention funds JMR withheld under the subcontracts. In posttrial proceedings, the court issued an order determining JMR

was entitled to recover attorney fees in an amount to be determined for its successful defense of the cross-complaint. The court also awarded JMR $90,644.07 in expert witness fees pursuant to Code of Civil Procedure section 998[1] by concluding that JMR's total monetary recovery ($315,631 plus an undetermined amount of attorney fees) had exceeded the $375,000 amount of its pretrial settlement offers. SureTec and EAR filed separate appeals.

EAR makes seven arguments on appeal. First, it asserts there was no substantial evidence to support the trial court's finding it was liable to JMR for delays on the Project. Second, it argues the court erred by using the *Eichleay* method of calculating extended home office overhead damages. Third, it asserts the court erred by utilizing the modified total cost method of calculating disruption and delay damages. Fourth, it argues the court, in its statement of decision, failed to address essential matters of fact and law. Fifth, it contends the court erred in determining JMR was entitled to attorney fees in defending the cross-complaint. Sixth, it asserts JMR was not entitled to recover its expert witness fees pursuant to section 998. And seventh, it contends the court erred by denying its motion for new trial.

SureTec contends JMR cannot prevail against SureTec because JMR failed to declare EAR in default under the subcontracts, and JMR failed to notify SureTec of any such default. It also contends the order finding JMR entitled to attorney fees on EAR's cross-complaint was improper as to SureTec. Further, it contests the award to JMR of expert witness fees under section 998. And it argues that SureTec's liability must be limited to a maximum of $471,881, the ceiling of its liability under the performance bond on the plumbing subcontract.

In the published portion of this opinion, we conclude the court did not err in its utilization of the *Eichleay* method to calculate extended home office overhead damages and in its use of the modified total cost method of calculating JMR's disruption and delay damages. We also hold the court did not err in finding SureTec liable under the performance bonds, concluding that neither JMR's formal declaration of EAR's default nor its formal notice to SureTec of EAR's default was a condition precedent to JMR's recovery under the bonds. In the unpublished portion of this opinion, we conclude (1) there was substantial evidence supporting the court's finding that EAR was liable to JMR for Project delays; (2) the court's statement of decision was not defective; (3) defendants' challenges to the interim, nonfinal, postjudgment order determining that JMR was entitled to recover attorney fees in defending the cross-complaint are not cognizable at this time; (4) defendants' challenges to the award of JMR's expert witness fees under section 998 are meritorious; (5) EAR's claim that the court abused its discretion in denying EAR's motion

---

[1] Further statutory references are to the Code of Civil Procedure unless otherwise specified.

for new trial has no merit; and (6) SureTec's request for an order that its maximum liability is $471,881 is not cognizable because it is a request for an advisory opinion. Accordingly we will affirm the judgment, reverse the order awarding expert witness fees, and remand the case for further postjudgment proceedings consistent with this opinion.

## PROCEDURAL BACKGROUND

On April 29, 2010, JMR filed its complaint against EAR and SureTec. JMR alleged four causes of action: (1) breach of the plumbing subcontract; (2) enforcement and foreclosure on the performance bond for the plumbing subcontract; (3) breach of the electrical subcontract; and (4) enforcement and foreclosure on the performance bond for the electrical subcontract. The first and third causes of action were alleged against EAR, while the second and fourth causes of action were alleged against SureTec.[2] JMR alleged that EAR's failure or refusal to perform its work under the two subcontracts in accordance with the Project's schedule "caused project delay, acceleration, and related damages to JMR." The alleged damages included "offset of JMR claims against the Owner, increased cost of JMR on-site performance costs and other loss of cost recovery and overhead on the Project." In each of the four causes of action, JMR claimed its damages were in an amount "not less than $200,000.00."

EAR filed a cross-complaint against JMR alleging breach of contract and common counts. It alleged in separate causes of action that JMR had breached the electrical subcontract and plumbing subcontract, and that as a result of these breaches, EAR had been damaged in an amount in excess of $108,913.31.

A five-day court trial took place in January 2012. After the parties submitted posttrial briefs in lieu of final argument, the court issued a ruling on April 30, 2012, finding in favor of JMR in the total amount of $379,318, which amount included a deduction of $121,893 that had been previously withheld from EAR under the subcontracts. The court further ordered that EAR take nothing on its cross-complaint.

Pursuant to the court's request, JMR submitted a proposed statement of decision in which it withdrew one of its claims and adjusted the amount of another claim, resulting in revised damages award of $315,631. The damages were derived by (1) adding five damage figures in amounts of $29,249 (air

---

[2] JMR also sought in the second and fourth causes of action to foreclose on the payment bonds issued by SureTec under the two subcontracts. The payment bonds are not at issue in this appeal.

compressor), $132,168 (field overhead for delay), $15,440 (field overhead for Project closeout), $14,244 (markup for field overhead), $60,693 (*Eichleay* home office overhead), and $185,730 (damages during framing and drywall phase) and (2) subtracting from this amount $121,893 previously withheld under the subcontracts. On July 19, 2012, the court signed the statement of decision. On August 14, 2012, the court entered judgment in favor of JMR and against defendants in the amount of $315,631. The court also ordered that EAR and SureTec take nothing on the cross-complaint[3] and that defendants were liable for JMR's costs, including attorney fees in defending the cross-complaint, in an amount to be determined after appropriate filings by JMR.

In postjudgment proceedings (discussed in greater detail, *post*), the court issued an order on November 13, 2012, granting JMR's request for recovery of expert fees of $90,644.07. In the same order, the court reaffirmed a prior tentative ruling that it would award attorney fees to JMR for its successful defense of EAR's cross-complaint in an amount to be determined at a later time.

## DISCUSSION

### I. *EAR's Appeal of the Judgment*

EAR asserts four challenges to the court's judgment. First, it contends there is no substantial evidence to support the court's finding that EAR breached its subcontracts with JMR. Second, it argues the court erred in using the *Eichleay* formula of calculating home office overhead damages. Third, it claims the court erred in applying the modified total cost method of damages in connection with alleged delay damages associated with the interior installation of metal studs and drywall (hereafter, the framing and drywall phase). And fourth, it argues the court's statement of decision was defective in that it failed to take into consideration essential matters of fact and law. We address each of these contentions below.

### A. *Sufficiency-of-evidence Challenge*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### B. *Challenges to the Calculation of Contract Damages*

In the alternative to its sufficiency-of-the evidence challenge, EAR contests the court's acceptance of the *Eichleay* formula of recovering home office

---

[3] The finding that SureTec take nothing on the cross-complaint appears to be in error, since EAR was the sole cross-complainant.

[*] See footnote, *ante*, page 571.

overhead damages. EAR also contends the court erred in applying the modified total cost method of calculating the cost associated with delays in the framing and drywall phase of the Project. We will address these two challenges after first identifying the appropriate standards of review. At the outset, however, we will present a summary of the evidence concerning JMR's claims of damages.

### 1. *Evidence Concerning Damages*

JMR presented evidence of damages that involved four categories: (1) field overhead delay damages; (2) home office overhead (*Eichleay* delay damages); (3) delay damages associated with the framing and drywall phase of the Project, utilizing the modified total cost method; and (4) costs associated with EAR's failure to supply an approved air compressor. We will not summarize the air compressor damages, since they are not at issue in this appeal. But given their interrelationship with the *Eichleay* delay damages, we will review the evidence of field overhead damages even though those damages are not directly challenged by EAR.

### a. *Field Overhead Damages*

Daniel Spade, JMR's project manager, testified that the Corps had rejected JMR's recovery of any extended overhead damages resulting from delays in the Project's completion. The Corps rejected these damages because there were concurrent delays caused by parties other than the Corps. At trial, JMR's construction management expert, John Elmer, explained that when the owner of a public works project causes delay, and a subcontractor or subcontractors concurrently cause delay, the owner may grant the general contractor an extension of time to complete the project, but it will not grant the general contractor compensable time (i.e., delay damages payable by the owner). Elmer testified that under such circumstances, the general contractor will typically seek delay damages from the subcontractor, under the theory that the general contractor "should have recovered compensable time, but . . . was precluded from [doing so] because of [the subcontractor's] delay."

Juan Perez, a construction expert retained by JMR, provided extensive testimony regarding JMR's delay damages attributable to EAR. Defendants did not challenge Perez's qualifications as an expert. Perez testified that he has had experience in presenting disruption claims on behalf of contractors. A disruption claim is based upon a contractor's intended performance or method of performance being impacted by another contractor or by an event, resulting in the contractor's performance being more costly because it is either done out of sequence or for an extended duration.

Perez calculated JMR's damages based upon (1) his review of the project documents, and (2) his reliance upon the opinions of John Elmer, JMR's

construction management expert. Specifically, Perez relied upon Elmer's opinions that (1) there was a critical path delay that extended the Project's completion by 180 days; (2) 180 days is reflected in change orders issued by the Corps extending the Project's completion date; (3) the parties responsible for the delays were the Corps and three subcontractors (EAR, Countywide Mechanical, and Del Monte Glass); (4) EAR and Countywide were each concurrently responsible for 142 days of the 180 days of delay; (5) within the 142-day period, Del Monte Glass was concurrently responsible for 28 days of delay.

Perez opined that, under the two subcontracts combined, EAR was responsible for at least 75 percent of the delay damages sustained by JMR during the 142-day concurrent delay period identified by Elmer. Perez arrived at this percentage allocation after considering (a) Elmer's allocation of EAR's responsibility for concurrent delays (63 percent); (b) a determination of EAR's percentage of the total contract value of the mechanical, electrical, and plumbing trades (67 percent); and (c) the percentage of punch list items for the 142-day concurrent delay period (83 percent).

Perez also rendered the opinion that JMR sustained field overhead damages associated with EAR's concurrent delay. Field overhead costs are the costs a contractor incurs in maintaining its field operations, including cost items such as storage trailers, office trailers, and a job superintendent's salary. Perez concluded that JMR's total field overhead damages for which EAR was responsible was $161,851.33.

### b. *Home Office Overhead Damages*

Perez testified that he calculated damages for JMR's home office costs (otherwise known as unabsorbed overhead costs) using the *Eichleay* formula. Perez explained that this formula "is a method of allocating those home office overhead costs to a project that [has] been extended or delayed." According to Perez, the *Eichleay* formula is the "exclusive method approved by the Federal Government to arrive at the fair compensation amount for unabsorbed overhead costs." He testified that "[b]ut for the concurrent delays on the project, the *Eichleay* [f]ormula would have been used by both JMR and the Government to arrive at the fair compensation amount for unabsorbed overhead costs that belonged to JMR."

### c. *Framing and Drywall Phase Damages*

JMR qualified its vice-president, Ron Rivard, as an expert witness in estimating interior framing and drywall work. Rivard had over 30 years' experience as a licensed general contractor, and approximately 35 years as an estimator in which he had estimated at least 300 jobs.

Rivard testified that he prepared the bid for the framing and drywall phase of the Project. In doing so, he utilized the plans in an electronic format and used computer software to perform a detailed cost takeoff. The takeoff yielded a bill of materials, and the software automatically assigned a labor factor indicating the number of labor hours associated with the particular area of work. The labor factor was based upon historical data, i.e., JMR's experience in constructing buildings similar to the building in the Project. The total bid for the framing and drywall phase was $220,000, an amount JMR assumed would be sufficient to perform the work in an orderly fashion and with a reasonable crew size. Rivard testified he was unaware of any mistakes in the bid, and opined that $220,000 was a reasonable cost for that phase of the Project.

Craig Connerty, a certified public accountant with 27 years of experience, testified as an expert on JMR's behalf. JMR had been a client of Connerty's accounting firm for over 15 years. Connerty reviewed the costs posted in JMR's books allocated to the framing and drywall phase of the Project. He testified that the total costs allocated to this phase was $461,535, and he reviewed the subcategories of those costs. Connerty "did a lot of testing with regard to the accounts for reasonableness" by selecting a number of different invoices for review before arriving at the $461,535 figure. Connerty also noted that this figure should be reduced by approximately $48,200 to account for costs that, based upon his conversation with Rivard, were erroneously posted to the framing and drywall phase.

Perez offered testimony relating to disruption damages for the framing and drywall phase. In forming his opinion, Perez spoke with job superintendent Steven Hupaylo, project manager Daniel Spade, and JMR's vice-president Ron Rivard. Perez also reviewed documents identifying the costs of the framing and drywall phase; certified payroll figures indicating the number of workers on the jobsite during that phase; and other correspondence. Perez relied on Hupaylo's testimony to the effect "that every wall was impacted by EAR's performance, meaning that the impacts and the costs [were] intrinsically intertwined [and it was] difficult if not impractical or impossible to segregate [the] individual impacts." In calculating disruption damages, Perez performed a "modified total cost analysis." He described this approach as follows: "[Y]ou would take a selected portion of the contractor's costs that he incurred and subtract from that the contractor's budget for those items, removing . . . items which were not part of the original budget . . . to ensure you're comparing apples to apples."

Thus, one component of Perez's calculation was the original bid. Perez did an independent analysis of JMR's bid for the framing and drywall phase. He found that Rivard's bid contained the kind of detail indicative of a good

estimate, the bid used methods that were "consistent with other contractors," and the bid was "based on historic[al] information[,] which is also important." Perez testified that he "was satisfied" with Rivard's bid and that the numbers within it "appeared reasonable." He noted that in comparing the material costs in the bid with the actual material costs, "the material estimate was almost dead on." He also noted that because labor estimates are based upon the material scheduled, the fact that the actual cost of materials was consistent with the estimate for those materials was "a good indication of a good estimate." He concluded that "if your material estimate is off, your labor estimate would be off. And Mr. Rivard's material estimate was on, was accurate."

Perez also reviewed the "logged" costs that related to the framing and drywall phase of the Project. This amount totaled $461,534. Perez subtracted the costs that had been incorrectly allocated to the framing and drywall phase. These were the same figures identified in the testimony of JMR's accounting expert, Craig Connerty. Perez also subtracted a per diem figure associated with the erroneously posted costs. Perez then calculated the total amount of disruption damages allocable to EAR relating to the framing and drywall phase, which he determined to be $185,729.

## 2. *Standards of Review*

An appellant's challenge to damages, depending upon its specific nature, may be subject to a substantial evidence, abuse of discretion, or de novo standard of review. The question of whether a plaintiff was, in fact, damaged by the defendant's breach of contract is reviewed for substantial evidence. (See *GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873 [274 Cal.Rptr. 168] (*GHK*).) The question of whether "a certain measure of damages is permissible given the legal right the defendant has breached, is a matter of law, subject to de novo review. [Citation.]" (*New West Charter Middle School v. Los Angeles Unified School Dist.* (2010) 187 Cal.App.4th 831, 843 [114 Cal.Rptr.3d 504] (*New West*); see *Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 579 [114 Cal.Rptr. 106, 522 P.2d 666].) But where the measure of damages is legally permissible, a trial court's choice of that measure, among other legally permissible measures of damages, is reviewed for abuse of discretion. (*New West*, at p. 843, citing *GHK*, at p. 873.)

EAR contends that neither the *Eichleay* formula nor the modified total cost method was legally authorized in this case. EAR does not make the further argument that, assuming the legal validity of these damage calculations, the court abused its discretion by selecting them over other legally permissible methods of computing damages. Accordingly, we review the legal propriety of the court's use of the two damages calculations de novo. In addition, EAR

contends that, even assuming the legal validity of the *Eichleay* formula, JMR failed to establish the requisite elements for its application, a question we review under the substantial evidence standard of review.

### 3. Challenges to the Eichleay *Formula*

#### a. The Eichleay *Formula*

■ As explained by JMR's expert, Juan Perez, the *Eichleay* formula "is a method of allocating those home office overhead costs to a project that [has] been extended or delayed." It originated from a case before the Armed Services Board of Contract Appeals (see *Eichleay Corp.* (A.S.B.C.A. 1960) 60-2 BCA (CCH) 2688), and it is typically used in federal litigation involving federal public works projects. (See, e.g., *P.J. Dick, Inc. v. Principi* (Fed.Cir. 2003) 324 F.3d 1364, 1370; *Altmayer v. Johnson* (Fed.Cir. 1996) 79 F.3d 1129, 1132–1133 *(Altmayer)*.) The Federal Circuit has held that "the *Eichleay* formula is the *only* means for calculating recovery for unabsorbed home office overhead." *(E.R. Mitchell Construction Co. v. Danzig* (Fed.Cir. 1999) 175 F.3d 1369, 1372, original italics; see *Nicon, Inc. v. U.S.* (Fed.Cir. 2003) 331 F.3d 878, 884.)

As explained by the *Altmayer* court: "Home office overhead costs are those that are expended for the benefit of the whole business, which by their nature cannot be attributed or charged to any particular contract. [Citation.] In contracting with the government, a company necessarily includes a portion of home office overhead expenses, which it calculates based on the contract's duration, in its estimate of costs to perform the contract. [Citation.] When the government delays or disrupts contract performance, ultimately requiring that it be extended, the contractor's stream of income from the government for the direct costs it has incurred under the contract is reduced or interrupted. [Citation.] However, home office overhead continues to accrue throughout both the original and extended performance periods, regardless of direct contract activity. [Citations.] This, of course, results in a reduction or interruption of payments for overhead, especially when, as here, the contractor has prepared a critical path schedule, for any delay along the critical path results in the delay of the overall project." *(Altmayer, supra,* 79 F.3d at p. 1132.)

■ There are three steps in the calculation of extended overhead using the *Eichleay* formula. They are (1) "to find [the] allocable contract overhead [by] multiply[ing] the total overhead cost incurred during the contract period times the ratio of billings from the delayed contract to total billings of the firm during the contract period; [(2)] to get the daily contract overhead rate, divide allocable contract overhead by days of contract performance; and [(3)]

to get the amount recoverable, multiply the daily contract overhead rate times days of government-caused delay. [Citation.]" (*Wickham Contracting Co., Inc. v. Fischer* (Fed.Cir. 1994) 12 F.3d 1574, 1577, fn. 3.)

### b. *Legal Propriety of Using* Eichleay *Formula*

EAR argues it was improper for the court to accept JMR's proffer of the *Eichleay* formula to establish its unabsorbed overhead damages caused by EAR's concurrent delay. EAR asserts there is no legal precedent for applying the formula because (1) there have been no published California decisions endorsing its use, and (2) there is no legal authority authorizing its use in situations, such as here, where the defendant causing the delay was not the government. EAR also urges that Perez, JMR's expert, "admitted application of the *Eichleay* formula is 'debated.' "[5]

■ Under Civil Code section 3300, a party may recover for a breach of contract a sum that will compensate it "for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." "[I]n the law of contracts the theory is that the party injured by a breach should receive as nearly as possible the equivalent of the benefits of performance. [Citations.] The aim is to put the injured party in as good a position as [it] would have been had performance been rendered as promised. This aim can never be exactly attained yet that is the problem the trial court is required to resolve. [Citation.]" (*Brandon & Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 455 [277 Cal.Rptr. 40]; see *Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 967–968 [22 Cal.Rptr.3d 340, 102 P.3d 257] (*Lewis Jorge*).) "Where the *fact* of damages is certain . . . the *amount* of damages need not be calculated with absolute certainty. The law requires only that some reasonable basis of computation be used, and the result reached can be a reasonable approximation." (*Acree v. General Motors Acceptance Corp.* (2001) 92 Cal.App.4th 385, 398 [112 Cal.Rptr.2d 99], fns. omitted, original italics (*Acree*); see *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 570 [137 Cal.Rptr.3d 693] (*SCI Cal. Funeral Services*).)

■ Delay damages are a common element recoverable by a party aggrieved by the breach of a construction contract. (See, e.g., *Coughlin v. Blair*

---

[5] Perez was asked if there was any criticism of the *Eichleay* formula. He responded: "I'm aware of . . . different cases—certainly *Eichleay* is a formula which is the subject of a lot of cases and the application of *Eichleay* is debated and . . . it's an evolving formula. And I try to keep up-to-date with the evolution of it, but that's what I'm aware of." After again being asked if he was aware of any criticisms of the formula, Perez responded: "Criticisms? Not criticisms more than just the applicability of it—of the formula."

(1953) 41 Cal.2d 587, 603–604 [262 P.2d 305] [plaintiffs entitled to damages for increased building costs and loss of use of property resulting from defendants' delay in performance of contract to pave road and install utilities]; *State of California ex rel. Dept. of Transportation. v. Guy F. Atkinson Co.* (1986) 187 Cal.App.3d 25, 32–34 [231 Cal.Rptr. 382] (*Guy F. Atkinson*) [contractor entitled to disruption and delay damages caused by material changes to contract ordered by state]; *Bird v. American Surety Co.* (1917) 175 Cal. 625, 631 [166 P. 1009] [delay damages incurred by owner, including rental losses, recoverable].) A subcontractor who is responsible for delaying the progress of a construction project may be held liable for delay damages incurred by the general contractor or by another subcontractor. (10 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 27:39, p. 27-182.) Increased overhead expenses incurred by a general contractor as a result of the subcontractor's breach may be an item of recoverable damages. (See *Allen v. Gardner* (1954) 126 Cal.App.2d 335, 344 [272 P.2d 99].)

As explained in one treatise: "A building contractor whose performance is delayed by the owner may have increased overhead and fixed costs resulting from a delay and may suffer labor and material cost increases or loss of labor productivity due to delays for all of which he or she would be entitled to damages." (Cassel et al., Cal. Attorney's Guide to Damages (Cont.Ed.Bar 2d ed. 2015) § 1.49, p. 1-50.) Extended home office overhead is one type of delay damages for which a contractor may seek recovery. (See Cal. Construction Contracts, Defects, and Litigation (Cont.Ed.Bar 2015) §§ 5.107, 6.86, pp. 5-73, 6-80; Gibbs & Hunt, Cal. Construction Law (17th ed. 2011) Construction Claims, § 6.07[F], p. 441.)

We acknowledge there are no reported California appellate decisions approving the use of the *Eichleay* formula. In the only reported California case addressing the formula, the appellate court did not decide the legal propriety of its use because the municipality against which such damages were sought did not dispute the formula's general applicability to construction delay claims. (See *Howard Contracting, Inc. v. G. A. MacDonald Construction Co.* (1998) 71 Cal.App.4th 38, 53 [83 Cal.Rptr.2d 590].)

■ We do not infer from the absence of California authority that the *Eichleay* formula is unavailable as proof of delay damages in this state. As has been observed in one treatise: "The federal government developed the *Eichleay* formula to compute the amount of home office overhead expense for which a government contractor should be reimbursed for a period of delay. Although the formula has not been discussed in a reported California case, it

is frequently used at the trial court level and in arbitration proceedings to compute damages." (Cal. Construction Contracts, Defects, and Litigation, *supra*, § 5.107, p. 5-73.)[6]

That the circumstances of this case are different from those in which *Eichleay* damages are typically discussed in reported decisions—i.e., the general contractor seeking delay damages *from a subcontractor*, rather than *from a governmental agency/owner*—does not preclude use of the formula. JMR presented unrebutted testimony from Daniel Spade that because there were concurrent delays, the Corps rejected JMR's effort to recover extended overhead damages from the Corps. And JMR's construction management expert, John Elmer, testified that when the owner of a public works project causes delay, but a subcontractor or subcontractors concurrently cause delay, the owner may grant the general contractor additional time but it will not grant the general contractor compensable time (i.e., delay damages). Elmer testified that under such circumstances, the general contractor will typically seek delay damages from the subcontractor under the theory that the general contractor "should have recovered compensable time, but . . . was precluded from [doing so] because of [the subcontractor's] delay." (See *William F. Klingensmith, Inc. v. U.S.* (Fed.Cir. 1984) 731 F.2d 805, 809 [contractor generally denied recovery for government-caused delays where there are concurrent delays and absent " 'proof a clear apportionment of the delay and expense attributable to each . . .' "]; Gibbs & Hunt, Cal. Construction Law, *supra*, Construction Claims, § 6.07[E], p. 440 [where owner causing project delays shows that "simultaneous cause of delay was the contractor's own mismanagement of the project," and delays "contributed to or overlapped the owner caused delays, then they may be considered concurrent and may be treated as noncompensable delays"].) EAR presented no expert testimony of its own to rebut JMR's expert testimony concerning *Eichleay* damages.

■ We conclude the trial court did not err in applying the *Eichleay* formula as a legally permissible method of determining JMR's home office overhead damages. We base this conclusion upon the expert evidence presented at trial, the general recoverability of extended home office overhead as an element of delay damages, and the federal courts' general acceptance of the *Eichleay* formula. In other words, the calculation of extended home office overhead damages using the *Eichleay* formula was an appropriate method to compensate JMR "for all the detriment proximately caused" by EAR's breach of contract. (Civ. Code, § 3300.) That recovery facilitates "[t]he goal [of placing] the plaintiff 'in as good a position as he or she would have occupied'

---

[6] We acknowledge it is stated elsewhere in the treatise that, because California courts have not adopted the *Eichleay* formula in any published decision, "[t]he applicability of [it] to public or private construction projects in California is questionable." (Cal. Construction Contracts, Defects, and Litigation, *supra*, § 6.86, p. 6-82.)

if the defendant had not breached the contract. [Citation.]" (*Lewis Jorge, supra,* 34 Cal.4th at p. 967, quoting 24 Williston on Contracts (4th ed. 2002) § 64:1, p. 7.) Indeed, it would be anomalous to allow recovery to JMR for *Eichleay* extended home office overhead damages in a claim against the government-owner—had there been no concurrent delay and where, as here, JMR had established the fact of such damages and causation—while denying such recovery from EAR where EAR was concurrently responsible for the delay.

### c. *Proof of Elements of* Eichleay *Formula*

██ EAR also challenges the use of the *Eichleay* formula on the basis that JMR did not establish the requisite elements for its application. The federal courts have identified three *Eichleay* requirements. "[T]he contractor [must] establish: (1) a government-caused delay; (2) that [the contractor] was on 'standby'; and (3) that [the contractor] was unable to take on other work. [Citation.]" (*Altmayer, supra,* 79 F.3d at p. 1133.) EAR asserts there was no evidence JMR was unable to take on other work.

JMR presented evidence, through Perez, concerning JMR's inability to obtain other work. Perez's expert testimony was based in large part upon his conversations with Rivard and JMR's bonding agent, Sharon Rusconi. Perez testified that JMR was a woman-owned business that received work on Small Business Administration "Section 8A" projects. Such projects are not strictly bid competitively; contract awards are largely dependent on the contractor's ratings. Perez testified that as a result of Project delays during the 142-day concurrent delay period, JMR's rating was downgraded to marginal. This rating downgrade negatively impacted JMR's ability to obtain new work. Rivard informed Perez that during the period of November 2007 through sometime in 2008, JMR could not obtain a bid bond. JMR was thus precluded from bidding on public projects and could not get other work.[7]

This evidence constituted substantial evidence of the third *Eichleay* prerequisite, i.e., "that [JMR] was unable to take on other work. [Citation.]" (*Altmayer, supra,* 79 F.3d at p. 1133.) Accordingly, EAR's claim that there was insufficient evidence supporting application of the *Eichleay* formula fails.[8]

---

[7] EAR did not assert any evidentiary objections at trial to this testimony, forfeiting any such objections on appeal. (See *SCI Cal. Funeral Services, supra,* 203 Cal.App.4th at pp. 563–565 [appellant's challenges to admissibility of expert testimony forfeited due to failure to preserve them in trial court].)

[8] EAR also argues JMR's damages were improperly calculated because Perez included impermissible expenses such as advertising and entertainment as part of its home office

#### 4. *Challenges to Modified Total Cost Method*

██ EAR contends the court erred in several respects in using the modified total cost method in its award of delay damages relating to the framing and drywall phase. "The total cost method derives damages as the difference between a contractor's actual costs and its original bid." (*Servidone Construction Corp. v. U.S.* (Fed.Cir. 1991) 931 F.2d 860, 861.) In the event some of the costs of the contractor are deemed unreasonable or were the result of "its own errors or omissions, then those costs are subtracted from the damages to arrive at a modified total cost. [Citation.]" (*Dillingham-Ray Wilson v. City of Los Angeles* (2010) 182 Cal.App.4th 1396, 1408 [106 Cal.Rptr.3d 691] (*Dillingham-Ray Wilson*); see Annot., "Total Cost Method (or Approach)" and "Modified Total Cost Method (or Approach)" to Proving Damages in State Contract Cases (2004) 124 A.L.R.5th 375, 389 [modified total cost approach may be utilized where most damages are attributable to defendant and "contractor can isolate and quantify those damages that arose due to causes for which the contractor is responsible"].) As explained by the California Supreme Court, to invoke the total cost method for recovering damages, a contractor must establish "(1) the impracticality of proving actual losses directly; (2) [its] bid was reasonable; (3) its actual costs were reasonable; and (4) it was not responsible for the added costs. [Citations.]" (*Amelco Electric v. City of Thousand Oaks* (2002) 27 Cal.4th 228, 243 [115 Cal.Rptr.2d 900, 38 P.3d 1120] (*Amelco*); see *id.* at pp. 243–244 ["trial court bears the initial responsibility of determining that each element of the four-part test" is satisfied].)

EAR, citing *Amelco, supra*, 27 Cal.4th at page 243, contends the total cost method of computing damages "is generally disfavored" under the law. Although not favored, the total cost method—along with its subcategory, the modified total cost method—has been recognized in California as an appropriate way of computing damages. (See, e.g., *Guy F. Atkinson Co., supra*, 187 Cal.App.3d at p. 32; *C. Norman Peterson Co. v. Container Corp. of America* (1985) 172 Cal.App.3d 628, 646–647 [218 Cal.Rptr. 592]; see also CACI No. 4541.) Further, although our high court in *Amelco*—because the municipality did not contest the issue—declined to decide whether the total cost formula was an appropriate method of calculating damages in a breach of a public contract case (*Amelco*, at p. 242), the Second District Court of Appeal, Division Two, concluded that the *Amelco* court in fact upheld common law principles "permit[ting] a public contractor to pursue either a total cost theory or a modified total cost theory." (*Dillingham-Ray Wilson, supra*, 182

---

overhead. But Perez testified that the advertising and entertainment expenses were insignificant and did not affect his calculation under the *Eichleay* formula.

Cal.App.4th at p. 1408.) The court reached this conclusion because *Amelco* cited *Guy F. Atkinson, supra*, 187 Cal.App.3d 25, and did not disapprove of the result in that case. (*Dillingham-Ray Wilson*, at p. 1408.)

The California Supreme Court has emphasized that one of the major concerns in the use of the total cost method is that it not be used as " 'a substitute for proof of causation' [citation]." (*Amelco, supra*, 27 Cal.4th at p. 244.) Here, there was substantial evidence of a causal connection between the extra cost JMR incurred in the Project's framing and drywall phase and EAR's breach of contract. Moreover, the cautionary statement in *Amelco* that the total cost method " 'should be applied only to the smallest affected portion of the contractual relationship that can be clearly identified' [citation]" was heeded: JMR used the modified total cost method to calculate damages related only to the framing and drywall phase of the Project, not to damages related to the entire Project. (*Ibid.*)

EAR also contends there was a lack of evidence to support a finding of the four prerequisites recited in *Amelco* (hereafter the *Amelco* elements) for use of the modified total cost method. As we discuss below, the trial court specifically addressed each of the *Amelco* elements in its statement of decision, and substantial evidence supported the court's conclusions that JMR established each element.

The trial court specifically found JMR had established the first *Amelco* element—"the impracticality of proving actual losses directly." (*Amelco, supra*, 27 Cal.4th at p. 243.) In so concluding, the court cited the testimony of JMR's job superintendent, Steven Hupaylo, which it found credible. As the court stated, Hupaylo had testified that JMR had a good design for performing the framing and drywall work, but he (Hupaylo) "had to wait for EAR to complete its rough-in work before he could complete the walls, and, because of EAR's delays, he never had all four walls and a ceiling in any room to work with." The trial court concluded: "Consequently, the disruption occurred throughout the entire period of that work, was not confined to one particular section or time, so [it] could not be tracked specifically as the disruption occurred." Furthermore, Perez testified, based upon Hupaylo's testimony, that because "every wall was impacted by EAR's performance, [this] mean[t] that the impacts and the costs are intrinsically intertwined [and it is] difficult if not impractical or impossible to segregate [the] individual impacts."

The trial court also found JMR had established the second *Amelco* element, i.e., the reasonableness of its bid. (*Amelco, supra*, 27 Cal.4th at p. 243; see Gibbs & Hunt, Cal. Construction Law, *supra*, Construction Claims, § 6.14[A], p. 471 [stressing the importance of accuracy of bid estimate to contractor's claim under total cost method].) The court noted that (1) Rivard, as an expert experienced in estimating, testified concerning his methodology

for preparing his bid, and opined that the bid for the framing and drywall phase was reasonable; (2) Perez reviewed the bid, noted that Rivard's methodology was consistent with other contractors and was based upon historical information, and was satisfied it was accurate; (3) Perez opined the $220,000 stated in the bid was a reasonable cost for the framing and drywall phase; and (4) EAR offered no expert testimony to rebut or contradict the reasonableness of the framing and drywall bid.

Likewise, the court concluded JMR's actual costs for the framing and drywall phase were reasonable—the third *Amelco* element. (*Amelco, supra*, 27 Cal.4th at p. 243.) In concluding that "the actual costs were reasonable and accurately recorded," the trial court cited to the testimony of JMR's experts, Connerty and Perez. It noted that Connerty reviewed JMR's costs associated with the framing and drywall phase, and that Connerty's work was "substantial." The trial court indicated that Connerty "did not just accept JMR's numbers; he [']did a lot of testing['] of the accounts for reasonableness by actually reviewing a number of invoices, and conducted an independent analysis."

Finally, the trial court found JMR was not responsible for the added costs—the fourth *Amelco* element. (*Amelco, supra*, 27 Cal.4th at p. 243.) It concluded EAR was solely at fault for the disruption in the completion of the framing and drywall phase. The court cited the testimony of Hupaylo that because of EAR's delays in "not having materials, not having skilled people, and sometimes not having any people working at all, JMR's crews had to work piecemeal" and in an inefficient manner to complete the work. The court "accept[ed] the testimony of Steve Hupaylo as accurate." It also relied on Perez's testimony that, based upon his review of certified payroll records, "the number of [EAR] workers reported on the certified payroll corresponded with the low percentage of completion." Perez also testified that EAR's rough-in work took four months to complete, notwithstanding that EAR had scheduled 34 days for the work. The trial court agreed with Perez's "conclusion that . . . JMR was confronted with the incomplete work and stacking of trades, which disrupted its efficiency."

EAR points to testimony it presented to suggest that JMR's cost overruns were due to its hiring of expensive out-of-town labor and the high level of quality required for the drywall finish. But the trial court rejected these arguments. The court indicated in its statement of decision that "Pendurthi's contrary conclusory explanations [regarding the framing and drywall disruption we]re not credible," and the court found Pendurthi's "testimony weak and unreliable." Moreover—as was the case with JMR's presentation of *Eichleay* damages—EAR offered no expert testimony to contradict JMR's showing that the modified total cost method was appropriate for calculating its damages associated with the framing and drywall phase.

As a variant of its contention that the court erred in concluding JMR was not responsible for the added cost, EAR argues, quoting from *Amelco, supra,* 27 Cal.4th at page 246, that damages were not recoverable under this method because JMR did not " 'distinguish between those inefficiencies that were [JMR's] and those believed to be the responsibility of the [Army] (and presumably other prime contractors and subcontractors).' " But the court rejected EAR's contention that JMR was responsible for inefficiencies in the framing and drywall phase, and there was substantial evidence to support the court's conclusion.

Lastly, EAR contends the disruption damages awarded by the court were "admittedly inaccurately calculated" because they failed to account for a $90,000 miscoding error about which Rivard testified. This argument relates to cross-examination in which defendants' counsel asked if Rivard had given prior deposition testimony to the effect that there was an approximate $90,000 miscoding of costs that were not related to the framing and drywall phase of the Project. Defendants raised this issue twice in their posttrial briefing. The trial court addressed this contention in its statement of decision. The court concluded that Rivard's deposition testimony concerning the "$90,000 coding overcharge" was essentially superseded by testimony from Perez and Connerty that, shortly before trial, Rivard advised them that the adjustment for miscoded items was approximately $48,200.[9] The trial court thus characterized the $90,000 coding error as a "relatively unfocused pre-trial examination estimate" that did not warrant further consideration in its award of damages. Giving deference to the court's role as trier of fact, we conclude there was no error in disregarding the purported $90,000 coding error in determining JMR's disruption damages.

We thus conclude there was no legal impediment to JMR's use of the modified total cost method of calculating its damages associated with the framing and drywall phase of the Project. The trial court was justified in concluding that JMR had established each of the four *Amelco* elements required for utilizing this method. (*Amelco, supra,* 27 Cal.4th at p. 243.) The fact that the damages claimed using this formula may have only been a reasonable approximation of JMR's loss associated with this phase of the Project is not an obstacle to its use, since the fact of such damages was established by substantial evidence. (*Acree, supra,* 92 Cal.App.4th at p. 398.)

---

[9] The statement of decision recites that the figure given by Rivard to Perez and Connerty shortly before trial was "a final $428,200 adjustment for items that were properly counted for tasks other than metal studs and drywall." This is an obvious typographical error, as Connerty testified the figure was "$48,200 and something" and Perez testified the figure was $48,262.

## C. *EAR's Challenges to the Statement of Decision*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II. *SureTec's Challenge to the Judgment Due to Lack of Default Notice*

SureTec contends the trial court erred in finding it liable under the performance bonds. It contends JMR was required, as a condition precedent under the bonds, to give (1) a declaration of EAR's default and (2) notice to SureTec of EAR's default. It argues that JMR's obligation to provide notice to SureTec of EAR's default "was a necessarily implied condition precedent" under the bonds.

The trial court held that JMR was entitled to recover from SureTec under the performance bonds, "whether or not JMR gave notice to [SureTec] of the default [by EAR]." In so concluding, the court relied in part on the language of Civil Code sections 2807 and 2808 (discussed, *post*).

There was undisputed evidence, based upon Rivard's testimony, that JMR did not formally declare EAR in default under either subcontract. Nor did JMR ask SureTec to complete the bonded work under either subcontract. At trial, Cynthia Vincent, a SureTec vice-president, testified that SureTec received no notice of any default under the plumbing or electrical subcontracts. She also testified that SureTec was not given the opportunity to complete work under either subcontract, and that JMR never asked SureTec to obtain new plumbing or electrical subcontractors.

### A. *Contractual Conditions Generally*

■ A conditional obligation is one in which "the rights or duties of any party thereto depend upon the occurrence of an uncertain event." (Civ. Code, § 1434; see Rest.2d Contracts, § 224 ["A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due."].) "[P]arties may expressly agree that a right or duty is conditional upon the occurrence or nonoccurrence of an act or event." (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 313 [24 Cal.Rptr.2d 597, 862 P.2d 158] (*Platt Pacific*).) A condition in a contract may be a condition precedent, concurrent, or subsequent. (Civ. Code, § 1435.) "[A] condition precedent is either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises." (*Platt Pacific*, at p. 313; see Civ. Code, § 1436.)

"The existence of a condition precedent normally depends upon the intent of the parties as determined from the words they have employed in the

---

[*] See footnote, *ante*, page 571.

contract. [Citation.]" (*Realmuto v. Gagnard* (2003) 110 Cal.App.4th 193, 199 [1 Cal.Rptr.3d 569].) But "stipulations in an agreement are not to be construed as conditions precedent unless such construction is required by clear, unambiguous language; and particularly so where a forfeiture would be involved or inequitable consequences would result. [Citations.]" (*Alpha Beta Food Markets v. Retail Clerks* (1955) 45 Cal.2d 764, 771 [291 P.2d 433] (*Alpha Beta Food*); see *Rubin v. Fuchs* (1969) 1 Cal.3d 50, 53 [81 Cal.Rptr. 373, 459 P.2d 925] [contract provisions are not construed as conditions precedent in the absence of language plainly requiring such construction]; *City of San Diego v. Haas* (2012) 207 Cal.App.4th 472, 493 [143 Cal.Rptr.3d 438].) Because "such conditions are not favored by the law, [they] are to be strictly construed against one seeking to avail [it]self of them. [Citations.]" (*Antonelle v. Lumber Co.* (1903) 140 Cal. 309, 315 [73 P. 966].)

### B. *Interpretation of the Contract Language*

We first address the standard of review applicable to SureTec's contention that JMR was required, as a condition precedent to seeking recovery under the performance bonds, to declare EAR's default and give SureTec notice of that default. Because no extrinsic evidence was introduced by the parties on the question, we independently review the trial court's interpretation of the bonds. (*Campbell v. Scripps Bank* (2000) 78 Cal.App.4th 1328, 1336 [93 Cal.Rptr.2d 635]; see also *Airlines Reporting Corp. v. United States Fidelity & Guaranty Co.* (1995) 31 Cal.App.4th 1458, 1461 [37 Cal.Rptr.2d 563] [appellate court reviews interpretation of bonds de novo].)

" 'A surety bond is a " 'written instrument executed by the principal and surety in which the surety agrees to answer for the debt, default, or miscarriage of the principal.' " [Citation.]' " (*American Contractors Indemnity Co. v. Saladino* (2004) 115 Cal.App.4th 1262, 1268 [9 Cal.Rptr.3d 835].) In the suretyship context, "the risk of loss remains with the principal, while the surety merely lends its credit so as to guarantee payment or performance in the event that the principal defaults. [Citation.] In the absence of default, the surety has no obligation. [Citation.]" (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 38 [86 Cal.Rptr.2d 855, 980 P.2d 407] (*Cates Construction*).) A performance bond, a species of a surety bond, is one in which the surety "guarantee[s] that obligations undertaken by the principal will be completed under the terms of the bonded contract." (1 Baier et al., Cal. Mechanics Liens and Related Construction Remedies (Cont.Ed.Bar 4th ed. 2015) Private Works Remedies, § 2.115, p. 2-89.) When the principal breaches its contract with the bond's beneficiary (i.e., the owner, or, in this case, the general contractor), "the surety's liability is generally coextensive with that of its principal. If the principal is liable under the contract, the surety is liable under the performance bond. [Citation.]" (*Id.* at p. 2-90.) This

may include, in the event of the principal's default, the surety's liability under the bond for "damages attributable to [its] principal['s] delay in performing [a] construction contract[]. [Citations.]" (*Cates Construction*, at p. 41.)

A surety contract is interpreted pursuant to the same rules that govern the interpretation of contracts generally. (*Pacific Employers Ins. Co. v. City of Berkeley* (1984) 158 Cal.App.3d 145, 150 [204 Cal.Rptr. 387] (*Pacific Employers*), citing *United States Leasing Corp. v. DuPont* (1968) 69 Cal.2d 275, 284 [70 Cal.Rptr. 393, 444 P.2d 65]; Civ. Code, § 2837.) To determine the surety's liability, "we look first to the express terms of the performance bond. [Citation.]" (*Cates Construction, supra*, 21 Cal.4th at p. 39.) Performance bonds typically incorporate by reference the general contract or subcontract for which the bond was issued. As such, " 'the bond and the contract should be read together and construed fairly and reasonably as a whole according to the intention of the parties.' [Citations.]" (*Id.* at pp. 39–40; see *Pacific Employers*, at p. 150 [generally, "contract performance bond will be read with the contract"].)

Each subcontract here requires EAR to furnish JMR, as the named obligee, a performance bond and a payment bond "to secure the faithful performance of the Subcontract Work and to satisfy all Subcontractor payment obligations related to the Subcontract Work." On November 10, 2006, SureTec issued separate performance bonds for EAR's electrical subcontract and its plumbing subcontract, listing the penal amounts of the bonds as $732,500 and $471,881, respectively. Each performance bond specifically incorporates by reference the respective subcontract for which the bond was issued.

The one-page "Articles" of the two performance bonds contain identical language. Article 1, containing the heading "SCOPE OF BOND," states: "The Principal [EAR] and the Surety [SureTec], jointly and severally, bind themselves . . . to the Obligee [JMR] for the performance of the Subcontract." Under the heading "EFFECT OF OBLIGATION," Article 2 provides: "If the Principal performs the Subcontract, then this bond shall be null and void; otherwise it shall remain in full force and effect." Article 4, under the heading "PRINCIPAL DEFAULT," provides: "Whenever the Principal shall be, and is declared by the Obligee to be in default under the Subcontract, with the Obligee having performed its obligations in the Subcontract, the Surety may promptly remedy the default, or shall promptly" (1) "[c]omplete the Subcontract in accordance with its terms and conditions"; (2) retain a new subcontractor to complete the Principal's work under the subcontract; (3) pay the Obligee the amount for which the Surety is liable; or (4) deny liability in whole or in part, providing an explanation for doing so.

Each subcontract details JMR's right to deduct or withhold payments to EAR, and JMR's rights in the event of EAR's breach. Furthermore, each

subcontract specifically requires JMR to provide written notice to EAR in a number of circumstances. Those circumstances include where (1) JMR elects to deduct from amounts otherwise due to EAR any sums EAR owes JMR; (2) JMR "deems it necessary and desirable to [withhold payments due to EAR to] protect itself against possible loss or damages"; (3) JMR concludes EAR has failed to (a) supply sufficient skilled workers, (b) adhere to the work schedule, (c) pay workers or suppliers, (d) follow the law, or (e) has otherwise materially breached the subcontract, requiring JMR to give EAR notice to cure the default; (4) JMR elects to suspend EAR's work under the subcontract; (5) the owner suspends its agreement with JMR; (6) JMR elects to terminate the subcontract due to EAR's material default of its obligations under the subcontract, after having given EAR written notice to cure; and (7) the owner terminates its agreement with JMR. None of these notice provisions requires JMR to give written notice *to the surety, SureTec*. Furthermore, each subcontract provides that the surety need not be advised of any changes, additions, or omissions to the subcontract.

## C. *Discussion*

SureTec implicitly acknowledges that neither performance bond *expressly* provides that JMR must give notice to SureTec of EAR's default as a condition precedent to SureTec's liability. Nor does SureTec assert that either performance bond expressly states that its liability is conditioned upon JMR's having given a prior declaration of default. But it asserts that "[a] contractual provision need not be expressly labeled 'condition precedent' to be treated as such. Rather, whether a provision is a condition precedent is to be determined from the whole contract, its purpose, and the intention of the parties." Quoting from *Wal-Noon Corp. v. Hill* (1975) 45 Cal.App.3d 605, 611 [119 Cal.Rptr. 646] (*Wal-Noon*), SureTec contends the default notice as a condition precedent " 'may be necessarily implied in the language of [the] contract . . . .' " And SureTec contends that "the bond language, read as a whole, makes clear that a declaration of default was a condition precedent to SureTec's liability. Applying principles of contract interpretation, we conclude that JMR was not required to declare EAR's default or give notice to SureTec of EAR's default as a condition precedent to SureTec's liability on the bonds.

The only notice language in the bonds is found in Article 3, where SureTec expressly "waive[d] notice of any alteration or extension of the Subcontract, including but not limited to the Subcontract price and/or time, made by the Obligee [JMR]." And the default provisions in the subcontracts—incorporated by reference into the bonds—include requirements in several instances that JMR give notice to EAR without any similar requirement of giving notice to SureTec. Thus, the bonds do not contain the requisite "clear,

unambiguous language" (*Alpha Beta Food, supra,* 45 Cal.2d at p. 771) that would support a finding that JMR was required to declare EAR's default or provide a notice of default to SureTec as a condition precedent to its liability under the bonds.

*Pacific Allied v. Century Steel Products* (1958) 162 Cal.App.2d 70 [327 P.2d 547] (*Pacific Allied*) is instructive. There, the defendant (Century) agreed to fabricate and sell steel forms to the plaintiff (Pacific) for the purpose of using them to install storm drains. (*Id.* at p. 72.) Century also guaranteed that Pacific's labor costs, through its use of Century's steel forms, would not exceed four cents per square foot, and that Century would, upon completion of the job and Pacific's submission of an itemized cost breakdown, pay Pacific's labor costs in excess of 4 cents per square foot. (*Id.* at p. 73.) Pacific agreed to keep a detailed account of labor costs and give Century a "continuous report." (*Ibid.*) Pacific kept Century apprised of costs during the project and gave it periodic oral reports, but it did not provide a detailed cost breakdown upon the project's completion. (*Id.* at p. 78.) The court rejected Century's contention that Pacific was required to provide a detailed cost breakdown as a condition precedent to its recovery under the contract. (*Id.* at pp. 79–80.) The appellate court held that (1) conditions precedent are not favored in the law; (2) neither the express terms of the contract nor a reasonable implication drawn from them compelled a finding that providing the cost breakdown was condition precedent to Pacific's recovery; and (3) the interpretation advanced by Century was particularly disfavored because it would result in a forfeiture. (*Id.* at pp. 79–80.)

Here, as in *Pacific Allied,* there was no language expressly conditioning SureTec's performance under the bonds upon JMR's declaration of EAR's default or SureTec's receipt of a notice of EAR's default from JMR. In *Pacific Allied,* there was an express agreement by the plaintiff to provide some level of notification (a detailed cost breakdown) to the defendant. Here, there was no such express covenant requiring JMR to declare a default or provide notice to SureTec of any such default.

We conclude that neither JMR's declaration of EAR's default nor its notice to SureTec of EAR's default is a condition precedent to triggering SureTec's liability under the bonds. This interpretation necessarily defeats SureTec's argument that a condition precedent should be implied from the language of the bonds. This interpretation is also consistent with the statutory mandate that courts, in construing an instrument, shall " 'not . . . insert what has been omitted, or . . . omit what has been inserted.' " (*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 954 [81 Cal.Rptr.3d 282, 189 P.3d 285], quoting § 1858.) Moreover, we observe that had SureTec desired to convey that its liability under the performance bonds was expressly conditioned by JMR's having previously declared a default and having given

SureTec notice of default, it could have readily included such language in the bonds. (See *Safeco Ins. Co. of America v. Robert S.* (2001) 26 Cal.4th 758, 763 [110 Cal.Rptr.2d 844, 28 P.3d 889] [applying § 1858 to reject insurer's contention that illegal act exclusion in homeowner's insurance policy should be construed as a "criminal act" exclusion, observing that if insurer had "wanted to exclude criminal acts from coverage, it could have easily done so" (italics omitted)]; cf. *Bank of Brewton, Inc. v. International Fidelity Ins. Co.* (Ala. 2002) 827 So.2d 747, 749 [addressing performance bond containing express condition that surety's obligation " 'shall arise after' " specified events, including the owner's obligation to give written notice to contractor and surety that it was considering declaring a default, and thereafter declaring the contractor's default].)

██ Likewise, our construction comports with the law governing surety-ships. "A suretyship obligation is to be deemed unconditional unless its terms import some condition precedent to the liability of the surety." (Civ. Code, § 2806; see *Bank of America v. McRae* (1947) 81 Cal.App.2d 1, 7 [183 P.2d 385] ["guaranty is unconditional unless its terms import some condition precedent to the liability of the guarantor"].) Here, Article 1 of each bond creates the unconditional obligation to the effect that EAR and SureTec "jointly and severally, bind themselves . . . to [JMR] for the performance of the Subcontract."

SureTec contends that, notwithstanding Article 1, its obligation here was discharged under Article 2 of the performance bonds, which reads: "If the Principal performs the Subcontract, then this bond shall be null and void; otherwise it shall remain in full force and effect." SureTec asserts that because EAR performed its obligations by completing its work under the subcontracts, the bonds became "null and void" under Article 2. This contention has no merit.

██ As discussed in detail, *ante*, the trial court found, based upon substantial evidence, that EAR breached the plumbing and electrical subcontracts by, among other things, delayed performance under the contracts and by disrupting the efficient completion of the framing and drywall phase of the Project. EAR's breach gave JMR the option to terminate the subcontracts, but it was not required to do so. (See *Whitney Inv. Co. v. Westview Dev. Co.* (1969) 273 Cal.App.2d 594, 602 [78 Cal.Rptr. 302].) That JMR did not terminate the subcontracts as a result of EAR's breach does not absolve EAR of responsibility for breaching the contracts. "[Breach of contract d]amages for delay can result from either a total . . . or partial . . . failure of performance. In both cases, delay damages are an extra item of recovery in addition to the normal measure of damages. However, even when there has been complete perfor-mance of a contract, damages for delay can result when performance was not

completed on time." (Cal. Attorney's Guide to Damages, *supra*, § 1.49, pp. 1-49 to 1-50, citations omitted.)

Furthermore, under general suretyship law, Civil Code section 2807 provides that "[a] surety who has assumed liability for payment or performance is liable to the creditor immediately upon the default of the principal, *and without demand or notice.*" (Italics added; see Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2015) ¶ 6:3436, pp. 6I-72 to 6I-73 ["if the bond is silent, the obligee is not required to give the surety notice of the principal's default or make demand upon the surety for payment"].) Likewise, under Civil Code section 2808, a surety assuming liability "upon a conditional obligation . . . is [generally] not entitled to notice of the default of the principal."[12]

Thus, for instance, in *State Bd. of Equalization v. Balboa Ins. Co.* (1978) 89 Cal.App.3d 499 [155 Cal.Rptr. 205], the surety was held liable on sales tax surety bonds after the principal's default, notwithstanding the obligee's (State Board of Equalization's) failure to make demand for payment or its failure to include the surety on a notice of lien. (*Id.* at pp. 503–504.) The court explained that when the surety executed the surety bonds, "it did not put conditions of special or separate notice" upon its "agreement to stand good for [the principal's] tax liability." (*Id.* at p. 504.) Citing Civil Code section 2807, the court held the surety was liable under the bonds because neither the law nor the agreement required notice as a condition to the surety's liability. (*State Bd. of Equalization v. Balboa Ins. Co.*, at p. 504.)

SureTec relies on several out-of-state cases to support its contention that JMR was required to declare EAR's default and give SureTec notice of the default to recover under the bonds. Several of these cases were based upon the courts' interpretation of the relevant contracts under applicable Florida law. (See, e.g., *L & A Contracting v. Southern Concrete Services* (5th Cir. 1994) 17 F.3d 106 (*L & A Contracting*); *School Bd. of Escambia County v. TIG Premier Ins. Co.* (N.D.Fla. 2000) 110 F.Supp.2d 1351; *DCC Constructors, Inc. v. Randall Mechanical, Inc.* (Fla.Dist.Ct.App. 2001) 791 So.2d 575.) In *L & A Contracting*—a case relied upon by a number of the authorities cited by SureTec—the Fifth Circuit Court of Appeals concluded that a contractor's unequivocal declaration of the subcontractor's default was "a necessary precondition" to the surety's liability under a performance bond. (*L & A Contracting*, at p. 111; cf. *Colorado Structures Inc. v. Ins. Co. of the West* (2007) 161 Wn.2d 577 [167 P.3d 1125, 1134] [disagreeing with *L & A Contracting*, concluding that a proper interpretation of the bond's language in

---

[12] Civil Code section 2808 provides: "Where one assumes liability as surety upon a conditional obligation, . . . [the surety] is not entitled to notice of the default of the principal, unless [it] is unable, by the exercise of reasonable diligence, to acquire information of such default, and the creditor has actual notice thereof."

that case is that it created "liability, subject to a single express condition subsequent (the principal's prompt and faithful performance)"]; *Walter Concrete Construction Corp. v. Lederle Labs.* (N.Y. 2003) 788 N.E.2d 609, 610 [rejecting surety's claim that default notice was required, holding that had parties wished to make liability conditioned on default notice, they could have expressly so provided in performance bond].) But *L & A Contracting*, and other cases relied on by SureTec, did not involve a contractual interpretation of performance bonds under California law. And none of those authorities considered the appropriateness of implying a condition precedent relating to default notice in light of decisional authority prohibiting such a construction unless the contractual language plainly requires it. (See *Rubin v. Fuchs, supra,* 1 Cal.3d at p. 53; *Alpha Beta Food, supra,* 45 Cal.2d at p. 771.) Indeed, *L & A Contracting* does not discuss conditions precedent generally or the appropriateness of implying a condition not expressly stated in a contract. We therefore decline to follow the out-of-state authorities relied upon by SureTec. (See *People v. Uribe* (2011) 199 Cal.App.4th 836, 865, fn. 15 [132 Cal.Rptr.3d 102] [California courts not bound by out-of-state decisional authority].)

We read the performance bonds together with the subcontracts to which they relate in ascertaining the intentions of the parties. *(Cates Construction, supra,* 21 Cal.4th at pp. 39–40.) A number of provisions in the EAR subcontracts require JMR to give notice to EAR; none of these provisions requires notice to SureTec. The performance bonds themselves contain no express requirement of any notice to the surety. The only mention of notice in either bond is a provision under which SureTec waives notice of any alteration or extension of the referenced subcontract. Reading Article 1 together with Article 2 of each bond—in conjunction with the language of the subcontracts incorporated by reference—yields the conclusion that SureTec's obligation to JMR in the event of EAR's breach of the underlying subcontract is unconditional. (See *id.* at p. 41 [considering the documents "as a whole, the bond and underlying construction contract are fairly and reasonably read as requiring" surety to answer for principal's failure to perform under contract].)

We conclude the performance bonds did not require JMR to declare a default or give notice of a default to SureTec as a condition precedent to recovery under the bonds. Any interpretation of the bonds as implying such a condition precedent would be contrary to (1) suretyship principles (see Civ. Code, §§ 2806, 2807), and (2) the principle that conditions precedent should not be implied unless the construction is compelled by the clear language of the agreement, particularly here, where such an implied condition would result in a forfeiture. *(Alpha Beta Food, supra,* 45 Cal.2d at p. 771.)[13]

---

[13] SureTec also cites *Wal-Noon, supra,* 45 Cal.App.3d 605 in support of its position that a declaration of default and notice to SureTec of the default was an implied condition precedent

III.–VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed. The postjudgment order of November 13, 2012, awarding expert witness fees to JMR pursuant to Code of Civil Procedure section 998 is reversed, and the matter is remanded to the trial court for further proceedings consistent with this opinion. Statutory costs are awarded to respondent JMR.

Rushing, P. J., and Elia, J., concurred.

A petition for a rehearing was denied January 28, 2016, and the opinion was modified to read as printed above. The petition of appellant SureTec Insurance Company for review by the Supreme Court was denied April 13, 2016, S232325.

---

to recovery under the performance bonds. But *Wal-Noon* involved a landlord-tenant dispute in connection with the lease of a commercial building. The lessees, without the lessors' knowledge, replaced the premises' leaky roof, and later sought reimbursement from the lessors because the lease had imposed upon the lessors the obligation to repair and replace the roof and all exterior walls. (*Id.* at pp. 608–610.) The appellate court concluded that "notice as a condition precedent to the lessors' obligation to repair is not only clearly apparent from the terms of the written lease, it is indispensable to effectuate the intentions of the parties. [Citation.] It has been held that unless explicitly excluded therein, performance under an express covenant to repair is conditional upon notice from the tenant. [Citations.] Accordingly, we hold that notice is an indispensable condition precedent to [the lessors'] duty to perform under the covenant to repair." (*Id.* at p. 612.) Here, we address surety bonds and a surety-obligee relationship, not a commercial lease and a landlord-tenant relationship. Thus, the facts of *Wal-Noon* are distinguishable. This case, unlike *Wal-Noon*, requires application of suretyship principles (e.g., Civ. Code, §§ 2806, 2807). Those principles, along with the absence of a clear indication that the parties intended otherwise, compel our conclusion that neither a declaration of default nor a notice of default to SureTec was an implied condition precedent to recovery under the bonds.

*See footnote, *ante*, page 571.